Christopher B. Snow (Bar No. 8858)
Katherine E. Judd (#15567)
CLYDE SNOW & SESSIONS, P.C.
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111
Telephone:  801-322-2516
Fax:        801-521-6280

Attorneys for Plaintiff
_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
_____

| | |
|---|---|
| REBEKAH ELISABETH MEIER, | |
| Plaintiff, | COMPLAINT |
| -vs- | (JURY DEMANDED) |
| KENNECOTT UTAH COPPER LLC and RIO TINTO AMERICA INC. and Does I Through X, | Civil No.  2:11-cv-00287<br>Judge Clark Waddoups |
| Defendant. | |

_____

Plaintiff Rebekah Meier ("Ms. Meier"), by and through her attorneys, hereby complains against Defendants, Kennecott Utah Copper LLC and Rio Tinto America Inc., also referred collectively herein as "Defendants," as follows:

### I.   NATURE OF THE CLAIM

1.   This suit is brought by a female former employee of Defendants Kennecott and Rio Tinto, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* ("Title VII"), 42 U.S.C. § 1981, as amended ("§ 1981"), arising from an ongoing practice and pattern of pervasive sexual harassment at the

{00206235-1}{00201561-3}

Defendants' facilities in South Jordan and Copperton, Utah.  Defendants' employees sexually harassed Plaintiff, failed to correct the sexual harassment when the conduct was reported and instead fired Plaintiff in retaliation.

2. In addition, Plaintiff also asserts a claim of breach of contract based on Defendants' improper conduct, acts, omissions, and misrepresentations to Plaintiff relative to unpaid compensation.

3. Plaintiff seeks all relief available under the law, including but not limited to, equitable relief, general and special damages, attorney fees, costs, interest, punitive damages, as well as declaratory and injunctive relief.

## II.   PARTIES

4. Plaintiff incorporates the allegations of the above paragraphs herein.

5. Plaintiff, Rebekah Meier, is a Utah resident and was an "employee" of Defendants at all relevant times within the meaning of § 2000e(f) of Title VII and other relevant federal statutes and law.

6. Defendant, Kennecott, is a limited liability corporation with offices in Salt Lake County.  Defendant, Rio Tinto, is the parent company of Defendant, Kennecott.

7. Defendant, Kennecott, was an "employer," at all relevant times, within the meaning of 2000e(b) of Title VII, and other relevant federal statutes and laws. Defendants, Does I through X, are employees of Defendants that may later be implicated during discovery.

8. Defendant, Rio Tinto, was an "employer," at all relevant times, within the meaning of 2000e(b) of Title VII, and other relevant federal statutes and laws.

Defendants, Does I through X, are employees of Defendants that may later be implicated during discovery.

### III.   JURISDICTION AND VENUE

9. Plaintiff incorporates the allegations of the above paragraphs herein.

10. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5, 42 U.S.C. § 1981, and Utah law.  Jurisdiction of this Court is conferred pursuant to 28 U.S.C. §§ 1331, 1337 and 1343.

11. Venue is proper with this Court as all the acts of discrimination alleged to be unlawful were committed within the jurisdiction of the United State District Court for the District of Utah, Central Division, and pursuant to 28 U.S.C. § 1391(b).

12. Plaintiff filed a charge of discrimination with the Utah Anti-Discrimination and Labor Division ("UALD") and has otherwise exhausted her administrative remedies within the meaning of Title VII.  *See* Charge, attached as Exhibit 1.

13. The U.S. Department of Justice issued Plaintiff a Notice of Right to Sue on February 11, 2011, and Plaintiff has filed this Complaint within ninety (90) days of receipt of such notice.  *See* Notice of right to sue, attached as Exhibit 2.

### IV.   GENERAL ALLEGATIONS

#### a. **Defendants Kennecott and Rio Tinto**

14. Plaintiff incorporates the allegations of the above paragraphs herein.

15. Defendant, Kennecott, is a Utah limited liability corporation and employs 2,400 employees throughout Utah.

16. Defendant, Rio Tinto, is the parent company of Defendant, Kennecott, and is an international company with offices throughout the world.

### b. **Plaintiff Rebekah Meier**

17. Plaintiff incorporates the allegations of the above paragraphs herein.

18. Plaintiff, Rebekah Meier, is a resident of Cache County, Utah.

19. Ms. Meier received her law degree from Georgia State University and has been licensed to practice law in Utah since 2002.

20. On or about April 24, 2006, Kennecott hired Ms. Meier as an Associate General Counsel primarily focused on transactional law.

21. During her more than four year tenure at Kennecott, Ms. Meier was repeatedly recognized as a high performing employee. She was rapidly promoted through the ranks becoming a Certified Green Belt in June 2007, a Certified Black Belt in February 2009, and Lead Strategic Black Belt in February 2010.

22. Since September 2007, Ms. Meier has worked in Kennecott's Business Improvement Team ("B.I. Team") as a project manager and is the only female employee on the team.

23. After saving Kennecott over $270 million since early 2009, her achievements were recognized by the company in November 2009, when she was given an award for the most Lean Six Sigma projects ever completed at Kennecott by an individual.

24. Her last evaluation was completed on June 25, 2010, where she was told by her supervisor, Mr. Joshua Brown ("Mr. Brown"), that she was the highest performer

in the division and that she was the only one in the B.I. Team that was deemed promotable.

25. Despite these contributions and repeated recognition, Ms. Meier was terminated on July 14, 2010. Her termination occurred only one week after reporting to her human resource manager, Ms. Beverly Whetstone ("Ms. Whetstone"), that she had endured a pervasive pattern of lewd and inappropriate conduct by Mr. Brown since February 2010.

*Sexual Harassment*

26. On or about February 5, 2010, Mr. Joshua Brown was assigned as Ms. Meier's supervisor.

27. Shortly, thereafter, Mr. Brown began to engage in a regular and repeated pattern of inappropriate sexual comments which were solely directed at Ms. Meier and occurred almost on a daily basis until July 7, 2010. Examples of Mr. Brown's comments include, but are not limited, to the following:

   a. Mr. Brown discussed having to undergo surgery to repair his vas deferens and a varicose vein on his penis. He described in graphic details the surgical procedure and the affect the procedure had on his penis including the pain that he was under when he returned to work that day after his surgery.

   b. He again discussed his sore penis in detail with Ms. Meier explaining that he had "overdone it" on his recent California trip.

c. Mr. Brown discussed his follow-up appointment with Dr. Hopkins, his urologist, and revealed that although his testosterone was very low, he questioned the diagnosis because of his sexual "track record."

d. Mr. Brown discussed in graphic detail the resumption of sexual relations with his wife.

e. Mr. Brown discussed the scar on his penis. A newly hired employee, Mr. Steve Whites, overheard the discussion. Mr. Brown was comparing the scar on his penis to the scar his brother received from a vasectomy. This occurred during a meeting where Mr. Brown was to discuss the promotion of Ms. Meier within the B.I. Team and her salary increase.

f. Mr. Brown informed Ms. Meier that her new role and pay increase had been approved and he wished to meet with Ms. Meier again. Ms. Meier quickly learned this was a pretext for a meeting since Mr. Brown immediately directed the discussion to his recent bike ride and the severe pain in his penis that had resulted. He also raised concerns that he may have damaged his penis.

g. Mr. Brown discussed that he and his wife were having sex several times a day to try and get pregnant. He indicated that this level of activity would taper off after she got pregnant so he would "enjoy it while I can." He also discussed a weekend trip he had just taken

      with his wife, which led to a detailed description of all the locations where they had sex.

   h. Mr. Brown updated Ms. Meier on his sexual experiences of the previous week while she was on vacation. The conversation again arose under the pretext that they were to discuss Ms. Meier's raise.

   i. Further inappropriate sexual conversations occurred, including a discussion of Mr. Browns' sex life, his wife's belief she may be pregnant, and that activity in the marital bedroom would now likely subside.

   j. After a follow up urologist examination, he told Ms. Meier that his "problem" had not been fixed and he was unsure how his wife got pregnant.

28. On many of the occasions, Ms. Meier told Mr. Brown that he was giving her too much personal information and that she was uncomfortable with the conversations. She also indicated that it was unlikely that his wife would appreciate his disclosing such personal information to her. Nonetheless, the conversations always continued.

29. In an effort to avoid these conversations, Ms. Meier would attempt to change the subject and sometimes make excuses to end the inappropriate conversations.

*Promotion and Promises of Increased Pay*

30. As mentioned above, Mr. Brown approached Ms. Meier on or about February 11, 2010, to discuss his plan to create a new position of Lead Black Belt/Project Manager and offer her the promotion, with increased responsibilities.

31. While Ms. Meier conveyed her interest in the promotion during several subsequent meetings with Mr. Brown and his supervisor, Mr. Terry Maio ("Mr. Maio"), she also expressed her hesitancy in accepting the job without knowing the associated compensation increase and salary band.

32. Over the next several weeks, Mr. Brown repeatedly promised that if Ms. Meier accepted the promotion, her annual salary would increase by at least $20,000 to $25,000, which was the highest salary allowed under her salary band. She was also told that the raise would be retroactive to the date of her acceptance and that the retroactive amount would be paid as a lump sum payment.

33. Mr. Maio also confirmed to Ms. Meier that if she accepted the promotion, her salary would increase as described in paragraph 33 above.

34. Based on the assurance of both Mr. Brown and Mr. Maio, Ms. Meier accepted the promotion.

35. Mr. Brown informed Ms. Meier that her salary increase had been approved.

36. Nevertheless, Ms. Meier never received her pay increase despite Mr. Brown's statements and guarantees.

*Hostile Workplace and Retaliation*

37.     On June 29, 2010, a conversation arose between Ms. Meier and Mr. Brown where the discussion was again quickly turned to the topics of Mr. Brown's penis, his scar, and the ineffectiveness of the surgery in fixing his infertility issues.

38.     Mr. Brown suggested he would have to show his penis to Ms. Meier so she could see why he was so upset.  He emphatically assured her that he was quite virile and that he could not imagine what life would be like if everything functioned normally because he already had such a high level of testosterone and a strong sex drive.

39.     Ms. Meier was very disturbed and emotionally distraught by Mr. Brown's comments and his desire to show her his penis.  In an attempt to remove herself from his presence, she told him that she would be going to her other office at the Rio Tinto Regional Center (RTRC) to meet with Mr. Dave Cunningham ("Mr. Cunningham"), a colleague with whom Ms. Meier often collaborated.  However, Ms. Meier realized that she was too upset and disturbed to continue working so she decided to return home, having already worked a full eight hour day.

40.     Later that night, Ms. Meier received an email from Mr. Brown where he reported having had a conversation with Mr. Cunningham where Mr. Cunningham indicated that she had never arrived at the RTRC that afternoon.

41.     In response to the email, she scheduled a meeting with Mr. Brown for the following morning to explain her plans with Mr. Cunningham.  She mentioned that she

planned to meet with him that entire day so as to assist Mr. Cunningham in completing all the assignments outlined in Mr. Brown's previous day's email.

42. Based on this information, Mr. Brown communicated his plan to overlook the previous day's events.

43. Nonetheless, and unbeknownst to Ms. Meier, Mr. Brown subsequently requested records from Rio Tinto's security department to verify all locations where Ms. Meier had been on June 29, 2010.

44. On Thursday, July 1, 2010, Mr. Brown scheduled another meeting with Ms. Meier to ask her directly if she was at the RTRC on the afternoon of Tuesday, June 29, 2010. She admitted she had not gone to the RTRC after leaving the UCD building. While Mr. Brown indicated that he could not do his job without her, he expressed his uncertainty over her allegiances. Mr. Brown assured her that any disciplinary action taken as a result of this incident would be handled within the department and would not involve human resources or anyone else.

45. A meeting was held on July 7, 2010, wherein Mr. Brown, Ms. Whetstone, the human resource manager, and Ms. Meier discussed Ms. Meier's absence on June 29, 2010.

46. Ms. Whetstone stated that she did not know of any policy that was violated by Ms. Meier and that no disciplinary action should be taken.

47. Rather, her recommended course of action was for Mr. Brown to draft a letter of reprimand to Ms. Meier that would be kept in Mr. Brown's possession, and not

in Ms. Meier's employee file. After a few months, the letter was to be destroyed so long as Ms. Meier continued to comply with company policy.

48. It was only after the meeting and outside the presence of Mr. Brown that Ms. Meier felt comfortable to fully explain the events of her absence on June 29, 2010, to Ms. Whetstone.

49. Immediately following Ms. Meier's meeting with Mr. Brown and Ms. Whetstone, Ms. Meier asked to meet with Ms. Whetstone privately in Ms. Meier's office.

50. Ms. Meier proceeded to tell Ms. Whetstone that there was more to the events of June 29, 2010, than had been previously revealed during the meeting with Mr. Brown. She laid out the sexual harassment she had experienced from Mr. Brown, including the inappropriate discussions involving his genitals and sex life.

51. Ms. Whetstone responded by saying that she could tell Ms. Meier was upset with Mr. Brown during the earlier meeting. She stated that it was her belief that the events of June 29, 2010, were caused by Mr. Brown, and once she had heard the full story, she understood why Ms. Meier was so upset with him.

52. Ms. Meier also agreed to speak with Mr. Maio about the sexual harassment if that became necessary, which she subsequently did.

53. At this time, Ms. Meier stated to Ms. Whetstone and Mr. Maio that because Mr. Brown had made the environment so hostile and difficult, she was prepared to resign immediately and submit her letter of resignation.

54. Mr. Maio asked her not to submit the letter and assured her that the issue would be worked out.

55. Nevertheless, Ms. Meier was immediately placed on leave while Mr. Brown was allowed to continue working in his current role.

56. One week after reporting the sexual harassment, Ms. Meier was terminated on July 14, 2010, under the pretext of the events of June 29, 2010.

57. When Ms. Meier requested the findings of the alleged investigation, Mr. Maio stated that it was none of her concern and refused to provide any details of the investigation.

58. Prior to her reporting the sexual harassment, no disciplinary action of any kind had ever been taken against Ms. Meier.

59. Defendants have retaliated against Ms. Meier by applying policies in a discriminatory manner, and by terminating her for reporting sexual harassment.

60. Ms. Meier filed a charge of discrimination with the UALD and the EEOC on or about October 21, 2010, alleging sexual harassment and retaliation.

## V.  FIRST CLAIM FOR RELIEF
### (Sexual Harassment in violation of Title VII)

61. Plaintiff incorporates the allegations of the above paragraphs herein.

62. Plaintiff was the subject of sexual harassment by her supervisor and of retaliation by her employer, Defendants Kennecott and Rio Tinto.

63. Defendants are directly and vicariously liable for the hostile work environment created and maintained by employees, but not limited to, Mr. Brown, Ms. Whetstone, and Mr. Maio.

64. Defendant's employees' treatment of Ms. Meier was unwelcome and unsolicited, and demonstrated a severe and pervasive pattern of lewd and inappropriate conduct by a supervisor.

65. This type of treatment was so severe and pervasive that it altered the conditions of Plaintiff's employment and created an abusive working environment.

66. Once Defendants' management became aware of the sexual harassment perpetrated and the hostile environment created by Mr. Brown, they failed to take appropriate remedial action.

67. Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

68. Defendants' and its employees' unlawful conduct toward Plaintiff in violation of Title VII was done with reckless disregard for Ms. Meier's rights protected under federal law and as such the Defendant should be subjected to punitive damages where allowed.

### VI.  SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of Title VII)

69. Plaintiff incorporates the allegations of the above paragraphs herein.

70. Plaintiff's complaints and reports to managers and Human Resources of sexual harassment are statutorily protected activity under Title VII.

71. Plaintiff was subjected to an adverse employment action by being terminated for reporting sexual harassment.

72. Plaintiff was subjected to adverse employment action by being terminated within one week of reporting sexual harassment by her supervisor.

73. Plaintiff's reporting of sexual harassment is a protected activity.

74. Plaintiff has suffered and has damages, such as lost compensation, benefits, and emotional harm.

75. Defendants and its employees' unlawful conduct toward Plaintiff in violation of Title VII was done with reckless disregard for her federally protected rights, and as such the Defendants should be subjected to punitive damages where allowed.

### VII. THIRD CAUSE OF ACTION
### (Breach of Contract)

76. Plaintiff incorporates by reference the allegations of the above paragraphs herein.

77. Defendants' improper conduct, acts, omissions and misrepresentations constitute material breaches of the agreement between Defendants and Ms. Meier.

78. On or about February 24, 2010, Ms. Meier accepted a promotion of Lead Black Belt/Project Manager based on her managers' promises that the promotion included an annual pay increase of $20,000 to $25,000 that would be effective as of the date of her acceptance. She was told that any retroactive pay would be made in a lump sum payment.

79. Ms. Meier relied upon her managers' verbal promises of a significant pay increase when accepting her new role and responsibilities.

80. Defendants materially breached this agreement when they failed to pay the promised compensation.

81. As a direct and proximate result of Defendants' material breaches of the agreement, Ms. Meier has suffered injuries and been damaged in an amount to be proven at trial, together with attorneys' fees, costs, expenses and interest.

## VIII.   PRAYER

WHEREFORE, Plaintiff, respectfully requests that the Court enter judgment in her favor and against Defendants, and award the following relief:

a. Back pay, as statutorily allowed, in amounts to be determined at trial;

b. Front pay, in lieu of reinstatement;

c. Past and future medical damages;

d. Compensatory and consequential damages;

e. Punitive damages;

f. Injunctive and/or declaratory relief;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Attorneys' fees and costs of this action, including expert witness fees, as is appropriate and allowed; and

i. Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 25th day of March 2011.

                                              CLYDE SNOW & SESSIONS

                                              /s/Christopher B. Snow
                                              CHRISTOPHER B. SNOW
                                              KATHERINE E. JUDD
                                              Attorneys for Plaintiff

Plaintiff's Address:
Rebekah Meier
c/o Clyde Snow & Sessions
201 S. Main Street, 13th Floor
Salt Lake City, UT 84111